IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

SENGCHANH PHOUDAVONG          )
and KUNGTHONG PHOUDAVONG,      )
                              )
          Plaintiffs,          )    TC-MD 130147N
                              )
     v.                        )
                              )
DEPARTMENT OF REVENUE,         )
State of Oregon,               )
                              )
          Defendant.           )    **FINAL DECISION**

The court entered its Decision in the above-entitled matter on December 11, 2013.  The

court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14

days after its Decision was entered.  The court's Final Decision incorporates its Decision without

change.

Plaintiffs filed their appeal challenging Defendant's Notice of Deficiency Assessment for

the 2010 tax year, dated January 15, 2013.  (*See* Ptfs' Compl at 4; Def's Ans at 1.)  A trial was

held in the Oregon Tax Courtroom on October 21, 2013.  De Nguyen (Nguyen), an Oregon

Licensed Tax Consultant, appeared and testified on behalf of Plaintiffs.  Sengchanh Phoudavong

(Sengchanh); Kungthong Phoudavong (Kungthong)[1]; Patrick Singh (Singh); and Kongkeo

Chayasing (Chayasing), each testified on behalf of Plaintiffs.[2]  John Koehnke (Koehnke), Tax

Auditor, appeared and testified on behalf of Defendant.  Plaintiffs' Exhibits 1 through 8 and

Defendant's Exhibits A through U and W were received without objection.

/ / /

---

[1] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and references to two individuals with the same last name, Phoudavong.  To avoid confusion, the court will use the first name of the individual being referenced.

[2] Sengchanh, Kungthong, and Chayasing testified through a court-provided Laotian interpreter.

## I. STATEMENT OF FACTS

In the 2010 tax year, Sengchanh operated a sole proprietorship under the business name "Seng Mushroom Products LLC." (Def's Ex A at 8.) Sengchanh "earn[ed] commissions by buying wild mushrooms for two venders[:] Grand Hale Marine Products Co LTD [Grand Hale] and Emperor Specialty Foods LTD [Emperor] locate[d] in Canada." (Ptfs' Ltr at 1, Sept 27, 2013.) Plaintiffs explained that the vendors provided funds to Sengchanh by "wire transfer[] to his bank accounts" and Plaintiffs "cash[ed] out" those funds "to purchase mushrooms from the pickers at Chemult and Springfield Stations." (*Id.*) Sengchanh "was paid by commissions * * * per pound of purchased mushrooms[.]" (*Id.*; *see also* Ptfs' Ex 2.)

Kungthong testified that in 2010 Plaintiffs had four bank accounts. (*See* Ptfs' Ex 3.) She testified that vendors deposited money into Plaintiffs' bank accounts and Plaintiffs withdrew that money to purchase mushrooms. Kungthong testified that Plaintiffs re-deposited any money that was not used to purchase mushrooms, although not necessarily in the same account from which the money was withdrawn. (*See id.*)

Plaintiffs filed a federal Schedule C for the 2010 tax year reporting gross receipts of $86,200 and total expenses of $71,216. (Def's Ex A at 8.) Plaintiffs reported business expenses including car and truck expenses; depreciation; legal and professional services; office expense; rent or lease expense; taxes and licenses; travel; and other expenses. (*Id.*)

Koehnke audited Plaintiffs' 2010 Schedule C and made adjustments to Plaintiffs' Schedule C income and expenses. (*See* Def's Exs C, E.) After Plaintiffs filed this appeal, Koehnke reviewed additional information provided by Plaintiffs and revised his adjustments. (*See* Def's Exs D, F, W.) Koehnke utilized a bank deposit analysis to test Plaintiffs' reported income and determined that Plaintiffs understated their 2010 gross receipts by $64,500. (*See*

Def's Ex W at 5; Def's Ex D at 1.) Keohnke allowed business expenses of $23,733 for "business expenses includ[ing] car and truck, depreciation, legal and professional services, propane and electric, phone, and rent expenses." (Def's Ex W at 2.) Plaintiffs disagree with several of Koehnke's adjustments to their 2010 income and expenses. (*See* Ptfs' Ltr at 1, Sep 27, 2013.)

A. *Income*

Plaintiffs reported gross receipts of $86,200 on their 2010 Schedule C. (Def's Ex A at 8.) Koehnke utilized a bank deposit analysis to test Plaintiffs' reported income and determined that Plaintiffs understated their 2010 gross receipts by $64,500. (*See* Def's Ex W at 5; Def's Ex D at 1.) Plaintiffs assert that "[c]ash withdraw[n] from transferred funds and deposited back should not be considered as Taxable Income." (Ptfs' Ltr at 1, Sep 27, 2013.)

1. *Payments from Emperor*

Plaintiffs reported that in 2010 Emperor purchased 189,836.53 pounds of mushrooms and paid Sengchanh commissions totaling $78,922.04. (Ptfs' Ex 1 at 1; Ptfs' Ltr at 1, Sept 27, 2013.) A letter from Emperor dated September 24, 2013, states that in 2010 Emperor purchased 208,348 pounds; made "total advances" of $627,000; paid commissions totaling $75,922.04; and paid bonuses totaling $3,000. (Ptfs' Ex 2 at 1.)

Plaintiffs provided 79 commission worksheets dated from September 10, 2010, through December 6, 2010. (Def's Ex D at 118-196.) The worksheets do not identify the vendor, but Sengchahn testified that the worksheets were for Emperor. Kungthong testified that the worksheets include the "opening balance" of "cash available"; the weight and cost of mushrooms purchased; the commission; and the "net purchase," which is the total of the cost of mushrooms plus the commission. (*See, e.g.,* Def's Ex D at 118.) Some of the worksheets identify the commission rate as $0.40 per pound. (*See id.*) The letter from Emperor stated that the

commission rate in 2010 was $0.75 per pound. (Ptfs' Ex 2 at 1.) Although the letter identifies the commission rate as $0.75 per pound, the total commissions paid based on purchases indicates a commission rate of $0.36 per pound, rounded.[3] (*See id.*) The commission worksheets indicate that, in total, 193,596.73 pounds of mushrooms were purchased and $77,410.21 in commissions were paid. (Def's Ex D at 118-196.) Those totals reflect a commission rate of $0.40 per pound.

Koehnke noted that Plaintiffs' bank statements and spreadsheets indicate that at least $25,388 worth of mushrooms were purchased between January 20, 2010, and February 17, 2010. (Ptfs' Ex 3 at 31.) No commission worksheets were provided for January or February 2010. No explanation was provided for the lack of worksheets from January and February 2010.

2. *Payments from Grand Hale*

Plaintiffs reported that in 2010 Grand Hale purchased 48,735.02 pounds of mushrooms and paid Sengchanh $6,250. (Ptfs' Ex 1 at 1; Ptfs' Ltr at 1, Sept 27, 2013.) A letter from Grand Hale states that Sengchahn received three commissions of $1,500 in September 2010 and one commission of $1,750 in October 2010. (Ptfs' Ex 2 at 2.) Plaintiffs provided a "Vendor QuickReport" for Grand Hale stating that between September 8, 2010, and October 25, 2010, Grand Hale made advances totaling $331,000 to Plaintiffs.[4] (*Id.* at 3.) Sengchanh testified that he paid himself commissions out of the advances, but the Balance Detail sheet provided does not identify any commission payments. (*See* Ptfs' Ex 2 at 4.) Sengchahn testified that he also prepared commission worksheets for Grand Hale, but those were not provided as exhibits.

/ / /

/ / /

---

[3] $75,922.04 "commissions paid" divided by 208,348 pounds of mushrooms purchased equals a commission rate of $0.3644 per pound. (*Cf*. Ptfs' Ex 2 at 1.)

[4] The "Vendor Balance Detail" for Grand Hale indicates that an additional $2,521.50 was paid on November 23, 2010, for total advances of $333,521.50. (Ptfs' Ex 2 at 4.)

3.      *Other deposits*

Koehnke questioned Kungthong about deposits from "ORG=Joe Chung's" in September 2010 that totaled $15,946.  (Def's Ex D at 36.)  Kungthong testified that Plaintiffs received those funds from Joe Chung, but returned the funds because she did not want to work with Joe Chung.  Kungthong was unable to identify any evidence corroborating her testimony that Plaintiffs returned those funds to Joe Chung.  Koehnke questioned Kungthong about a $2,682 deposit from "ORG=Sunshine Foragers" on November 29, 2010.  (Def's Ex D at 114.)  Kungthong did not offer a clear explanation of that deposit.

4.      *Defendant's bank deposit analysis*

Plaintiffs provided "bank statements and commission reports" to Defendant.  (Def's Ex D at 1.)  Koehnke stated "[i]t appears that [Plaintiffs were] mixing personal and business activities among [their bank] accounts."  (*Id.*)  Koehnke used a "bank deposit analysis * * * to test gross receipts."  (*Id.*)  Based on the evidence provided prior to the exhibit exchange, Koehnke determined a total "understatement of gross receipts" of $134,500 for the 2010 tax year.  (*Id*. at 2.)  Koehnke stated at the beginning of trial that after reviewing the exhibits provided by Plaintiffs he determined that Plaintiffs' understatement of gross receipts should be reduced by $70,000, for a revised understatement of gross receipts of $64,500.  (Def's Ex W at 5.)

B.      *Expenses*

Plaintiffs reported expenses totaling $71,216 on their 2010 Schedule C.  (Def's Ex A at 8.)  Koehnke allowed business expenses totaling $23,733 for "car and truck, depreciation, legal and professional services, propane and electric, phone, and rent expenses."  (Def's Ex W at 2.)  Plaintiffs request additional business expenses be allowed for mileage, buying station leases, and payments to Chayasing for "helping" and "shipping."  (Ptfs' Ltr at 1-2, Sept 27, 2013.)

1.    *Mileage*

Plaintiffs claimed car and truck expenses of $25,043 on their 2010 Schedule C.  (Def's Ex A at 8.)  Koehnke stated that Plaintiffs "provided several mileage logs with different vehicles": 11,228 miles from home to Alaska with two vehicles; 10,532 miles from home to Springfield with a 2001 GMC; 14,688 miles from home to Chemult with a Toyota Tundra; 2,904 miles from home to Springfield with a Toyota Tundra; and 11,110 miles from home to Chemult with a Chevy Savana.  (Def's Ex F at 3.)  Based on a "[t]hird party letter from [a] vendor" supporting the business purpose of the trip and bank statements supporting the dates, Koehnke allowed "[t]he mileage log for 'home to Alaska with two vehicles' reporting 11,228 miles," for a car and truck expense of $6,175.  (Def's Ex F at 3-4; Ex W at 3.)

Singh testified that he is Plaintiffs' cousin and he assisted with the mushroom business. He testified that Plaintiffs maintained handwritten mileage logs for two vehicles, a Chevy Savanna and a GMC, both vans, but the logs included both business and personal mileage.  (Ptfs' Ex 8 (mileage log).)  Plaintiffs offered handwritten mileage logs for the Chevy and GMC, but had not previously provided those logs to Defendant.  (Ptfs' Ex 8.)  Singh testified that he prepared spreadsheets detailing only business mileage based on Plaintiffs' mileage logs.  (Ptfs' Ex 5.)  Plaintiffs reported that the Chemult buying station was "216 miles from home - one way" and the Springfield buying station was "121 miles from home - one way."  (Ptfs' Ex 4 at 1.)

The spreadsheet for the GMC reported daily trips of 121 miles between September 10, 2010, and December 5, 2010, and a five-mile trip on December 6, 2010, for a total of 10,532 miles.  (Def's Ex G at 4-5.)  The handwritten mileage log reported that the GMC was driven 246 miles daily from September 10, 2010, to October 14, 2010; from November 1, 2010, to November 23, 2010; and from December 1, 2010, to December 5, 2010; and was driven 128

miles on December 6, 2010. (Ptfs' Ex 8 at 1-4.) The business purposes for all but one trip are identified as variants of "drop off mushrooms to summit corp get gas and return to buying station." (*Id.*) The mileage log indicates that 15,626 "business miles" were driven in the GMC in 2010. (*Id.*)

The spreadsheet for the Chevy reported 11,110 miles traveled to and from Chemult. (Def's Ex G at 4.) The handwritten mileage log for the Chevy listed business trips nearly every day between September 1, 2010, and October 11, 2010. (Ptfs' Ex 8 at 5-7.) The business purposes for the majority of trips are identified as variants of either "Drop off mushrooms to summit, return to station, get gas" or "Bring back mushrooms for shipping." (*Id.*) The handwritten mileage log indicates 15,290 "business miles" were driven in the Chevy in 2010. (*Id.*)

Singh testified that Plaintiffs also used two Toyota Tundras, one that was driven to Springfield and the other to Chemult. Singh testified that Plaintiffs each drove a Toyota Tundra during September and October 2010, and the Chevy and GMC were driven by others. Plaintiffs reported that they owned a Toyota Tundra and that they borrowed a second Toyota Tundra from Pany Veunnasauck. (Ptfs' Ex 8 at 9.) Plaintiffs provided an affidavit from Pany Veunnasauck stating that she owned a 2007 Toyota Tundra and she loaned it to Plaintiffs from September to October 2010. (*Id.* at 8.) Singh testified that no mileage logs for the Toyota Tundras exist.

Koehnke determined that, because the "mileage logs were recreated[,] handwritten evidence is required to support the mileage expenses" claimed by Plaintiffs. (Def's Ex F at 4.) Other than mileage to Alaska, Koehnke disallowed Plaintiffs' claimed mileage because no "handwritten records" were provided "to support the recreation of the mileage log[s]." (*Id.* at 3.) Koehnke noted that Plaintiffs' bank statements do not corroborate their reported mileage:

"the mileage logs for the month of November show[] 26 different days [that] * * * [P]laintiff[s] picked up funds.  The combination of all four bank statements provided shows only 14 different days could be accounted for when actual withdrawals were made for access of funds."

(*Id.*)  Koehnke also noted discrepancies and irregularities in the odometer readings reported by Plaintiffs for their vehicles.[5]  (*Id.*)

2.      *Rent or lease expenses*

Plaintiffs claimed expenses of $14,642 to rent or lease "other business property" on their 2010 Schedule C.  (Def's Ex A at 8.)  Keohnke allowed a rent or lease expense of $5,483, including $5,400 for a rental lease with Peter Kryl for warehouse and $83 for a stay at the Featherbed Inn on September 13, 2010.  (Def's Ex F at 6.)  Plaintiffs request that they be allowed additional "rental expenses of buying stations."  (Ptfs' Ltr at 2, Sept 27, 2013; Ptfs' Ex 6.)  Plaintiffs provided a "Receiving Record" from the Featherbed Inn in Chemult, Oregon stating $500 was paid for a "buy station" from "9/7/10 - 10/7/10" and $400 was paid for a "buy station" from "9/7/10 - 10/[blank]/10."  (Ptfs' Ex 6 at 1-2.)  The payor is not identified on the receipt. (*See id.*)  Plaintiffs' bank statements record a payment of $83 to the Featherbed Inn on September 20, 2010, and another payment of $175 on October 5, 2010.  (Def's Ex D at 37, 40.)

3.      *Expenses for "shipping" and "helpers"*

Under "other expenses," Plaintiffs listed $7,000 for "shipping cost" and $5,200 for "helpers" on their 2010 Schedule C.  (Def's Ex A at 9.)  Chayasing testified that he is a friend of Plaintiffs' and he helped Plaintiffs with their mushroom buying business in 2010.  He testified that he received $12,200 from Plaintiffs in 2010:  $5,200 as a "helper" and $7,000 for

---

[5] Koehnke wrote that, "[f]or example, the odometer reading on May 12, 2010 on the 2001 GMC vehicle shows 130,401.  On December 1, 2012 the same odometer reading is recorded.  In addition, * * * [P]laintiff[s] recorded an odometer reading of 113,388 on May 27, 2010.  For the Chevy Savana, * * * [P]laintiff[s] recorded 130,401 on May 12, 2010 which is the same mileage reported for the 2001 GMC vehicle."  (Def's Ex F at 4.)

"shipping." (Ptfs' Ex 7 at 2.) Chayasing testified that he was paid in cash during the 2010 mushroom season and that he received a one-time payment at the end of the year. He testified that he reported that income on his 2010 income tax return.

Plaintiffs provided a letter dated January 1, 2010, to Chayasing detailing his payments for the 2010 mushroom season. (Ptfs' Ex 7 at 2.) Koehnke asked how Chayasing knew what his 2010 payments would be on January 1, 2010, but no explanation was provided. Koehnke asked Chayasing about a spreadsheet detailing "delivery" payments to Chayasing. (Def's Ex K at 1.) Individual payments ranged from $65 to $350. (*Id.*) Chayasing testified that, for example, the payment of $350 on September 10, 2010, was for an eight-hour day of driving and he had to purchase fuel with that payment. (*Id.*) A second spreadsheet detailed payments to Chayasing for "sorting/helping," with payments ranging from $26.80 to $426.21 per day. (Def's Ex L at 1.) Chayasing testified that as a "helper" he would help with purchases and wrap packages.

Koehnke disallowed Plaintiffs' claimed expenses for "shipping" and "helpers." (Def's Ex F at 7.) He explained that Plaintiffs' claimed expenses for "shipping" and "helpers" were both cost for "paid labor." (*Id.*) Koehnke stated that "a 1099 is required for paid labor if that particular person earns $600 or more" under IRC section 6041,[6] and 1099s must be timely filed for a deduction to be allowed under ORS 305.217 and OAR 150-205.217. (*Id.*) Koehnke disallowed Plaintiffs' claimed expenses for "shipping" and "helpers" because Plaintiffs did not provide proof of payment and "because it appears * * *1099[s] [were] never issued." (*Id.*)

/ / /

---

[6] IRC section 6041(a) states, in part: "All persons engaged in a trade or business and making payment in the course of such trade or business to another person, of rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income * * * of $600 or more in any taxable year * * * shall render a true and accurate return to the Secretary, under such regulations and in such form and manner and to such extent as may be prescribed by the Secretary, setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment."

## II. ANALYSIS

"The Oregon Legislature intended to make Oregon personal income tax law identical to the Internal Revenue Code (IRC) for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon law." *Ellison v. Department of Revenue*, TC-MD No 041142D, WL 2414746 *6 (Sept 23, 2005) (citing ORS 316.007). "Further, the view of the Commissioner of Internal Revenue as to the legal analysis is always dispositive." *Porter v. Dept. of Rev.*, 20 OTR 30, 31 (2009); *see also* ORS 314.011(3).[7]

As the party seeking affirmative relief, Plaintiffs have the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). In an income tax appeal, this court has statutory authority to determine the correct amount of the deficiency, "even if the amount so determined is greater or less than the amount of the assessment determined by the Department of Revenue[.]" ORS 305.575.

A.      *Income*

Plaintiffs reported gross receipts of $86,200 on their 2010 Schedule C. Koehnke utilized a bank deposit analysis to test Plaintiffs' reported income and determined that Plaintiffs understated their 2010 gross receipts by $64,500.

"Gross income" is defined as "all income from whatever source derived * * *." IRC § 61(a).[8] All income is included in an individual's gross income unless otherwise provided

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

[8] All references to the Internal Revenue Code (IRC) and accompanying regulations are to the 1986 code, and include updates applicable to 2010.

by the Internal Revenue Code.  *Id.*  Defendant may prove the existence of unreported income "by any practical method available in the circumstances of the particular situation." *Flowers v. Dept. of Rev.*, 16 OTR-MD 151, 153 (1999) (citing *U.S. v. Doyle*, 234 F2d 788, 793 (7th Cir 1956)). "The reconstruction need only be reasonable in light of all surrounding facts and circumstances." *Petzoldt v. Comm'r,* 92 TC 661, 687 (1989).  "Bank deposits constitute prima facie evidence of income." *Ekwenugo v. Comm'r*, 102 TCM (CCH) 321, WL 4484788 at *3 (2011).  "[T]he taxpayer must prove that the reconstruction is in error and may do so, in whole or in part, by proving that a deposit is not taxable." *Id.*

In 2010, Plaintiffs maintained four bank accounts which they used for both business and personal purposes.  Funds were frequently deposited into and withdrawn from Plaintiffs' bank accounts and it is difficult to determine the purpose of many of those deposits and withdrawals. Plaintiffs' explanations of some deposits were unclear.  It is doubtful that Plaintiffs accurately recall all of their bank transactions in 2010 absent records to aid their recollections.

Plaintiffs provided some business records, including letters from Emperor and Grand Hale and commission worksheets prepared by Sengchanh for Emperor.  No commission worksheets for Emperor were provided for January and February 2010, nor were any worksheets for Grand Hale provided.  The records provided were inconsistent with respect to pounds of mushrooms purchased and the commission rate paid.  Under such circumstances, the court finds that Koehnke's bank deposit analysis was reasonable and persuasive.  Plaintiffs have failed to establish that any of the bank deposits identified by Koehnke were non-taxable.

B.      *Expenses*

Plaintiffs reported expenses totaling $71,216 on their 2010 Schedule C.  Koehnke allowed business expenses totaling $23,733.  Plaintiffs request additional expenses be allowed

for mileage, buying station leases, and payments to Chayasing for "helping" and "shipping."

IRC section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]" To be "ordinary," the transaction that gives rise to the expense must be of a common or frequent occurrence in the type of business involved. *Deputy v. Du Pont,* 308 US 488, 495, 60 S Ct 363, 84 L Ed 416 (1940) (citing *Welch v. Helvering* (*Welch*), 290 US 111, 114, 54 S Ct 8, 78 L Ed 212 (1933)). A "necessary" expense is one that is "appropriate and helpful" to the taxpayer's business. *See Welch*, 290 US at 113. Allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992).

Generally, if a claimed business expense is deductible, but the taxpayer is unable to substantiate it fully, the court is permitted to make an approximation of an allowable amount. *Cohan v. Comm'r* (*Cohan*), 39 F2d 540, 543-44 (2d Cir 1930). The estimate must have a reasonable evidentiary basis. *Vanicek v. Comm'r*, 85 TC 731, 742-43 (1985). IRC section 274 supersedes the *Cohan* rule and imposes more stringent substantiation requirements for certain expenses, including travel. *See* Treas Reg 1.274-5T(a). Under IRC section 274(d), a taxpayer must substantiate a claimed expense covered by section 274 with "adequate records or by sufficient evidence corroborating the taxpayer's own statement" establishing the amount, time, place, and business purpose of the expense. *See also* Treas Reg 1.274-5T(b).

1.      *Mileage*

IRC section 162 allows a taxpayer to deduct travel expenses incurred in connection with a trade or business. "Only such traveling expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted."

Treas Reg § 1.162-2(a).  IRC section 274(d) imposes strict substantiation requirements for

mileage expenses.  The Treasury Regulations clarify the "adequate records" requirement of

section 274(d):

> "[A] taxpayer shall maintain an account book, diary, log, statement of expense,
> trip sheets, or similar record * * * and documentary evidence * * * which, in
> combination, are sufficient to establish each element of an expenditure or use
> * * *. It is not necessary to record information in an account book, diary, log,
> statement of expense, trip sheet, or similar record which duplicates information
>
> reflected on a receipt so long as the account book, etc. and receipt complement
> each other in an orderly manner."

Treas Reg § 1.274-5T(c)(2)(i).  "Although a handwritten log is not required, corroborative

evidence to support a taxpayer's reconstruction 'of the elements * * * of the expenditure or use

must have a high degree of probative value to elevate such statement' to the level of credibility

of a handwritten record."  *Christine v. Comm'r*, TCM(RIA) 2010-144, WL 2640125 at *3 (2010)

(citing Treas Reg §1.274-5T(c)(1)).[9]

Plaintiffs failed to maintain mileage logs or other similar records for the Toyota Tundras.

The handwritten mileage logs for the Chevy and GMC provided at trial do not match the

spreadsheets prepared by Singh and previously provided to Defendant.  Even though the mileage

logs for the Chevy and GMC include categories for both "business" and "personal" mileage, the

total mileage reported in the "business" column of each log does not match the total mileage

reported on the spreadsheets provided by Singh.[10]  (*See* Ptfs' Ex 8; Def's Ex G at 4-5.)  Some

---

[9] Treas Reg § 1.274-5T(c)(1) states:  "A handwritten log is not required, but a record of the elements of an expenditure or of a business use of listed property made at or near the time of the expenditure or use, supported by sufficient documentary evidence, has a high degree of credibility not present with respect to a statement prepared subsequent thereto when generally there is a lack of accurate recall.  Thus, the corroborative evidence required to support a statement not [made] at or near the time of the expenditure or use must have a high degree of probative value to elevate such statement and evidence to the level of credibility reflected by a record made at or near the time of the expenditure or use supported by sufficient documentary evidence."

[10] The spreadsheet reported 11,110 miles for the Chevy whereas the mileage log reported 15,290 business miles.  (Ptfs' Ex 8; Def's Ex G at 4-5.)  The spreadsheet reported 10,532 miles for the GMC whereas the mileage log

specific trips reported on the mileage log do not match those on the spreadsheet.  For instance, Plaintiffs' mileage log reported two trips on September 9, 2010, one of 215 miles and the other of 231 miles.  (Ptfs' Ex 8 at 5.)  The spreadsheet provided to Defendant reported one trip of five miles and another of 219 miles.  (Def's Ex G at 4.)

The mileage logs and spreadsheets provided by Plaintiffs for the Chevy and GMC were confusing and inconsistent.  Plaintiffs did not provide any other evidence to corroborate the miles reported for either the Chevy or the GMC.  Plaintiffs provided bank statements but, as Koehnke noted, the bank statements do not corroborate the trips reported on Plaintiffs mileage logs or spreadsheets.  Plaintiffs have failed to prove by a preponderance of the evidence that any additional deduction for mileage should be allowed.

2.      *Rent or lease expenses*

Plaintiffs provided a receipt from the Featherbed Inn in Chemult stating that $400 and $500 were paid for "buy station[s]" in September and October 2010.  The payor is not identified. A review of Plaintiffs' bank statements revealed a payment of $83 to the Featherbed Inn on September 20, 2010, and a payment of $175 on October 5, 2010.  (Def's Ex D at 37, 40.)  It is unclear from the evidence presented who paid the Featherbed Inn $400 and $500 in September and October 2010.  Plaintiffs have failed to prove by a preponderance of the evidence that an additional deduction of $900 should be allowed for payments to the Featherbed Inn.

3.      *Expenses for "shipping" and "helpers"*

Through Chayasing's testimony at trial, it was explained that the expenses totaling $12,200 for "shipping" and "helpers" were cash payments to Chayasing for his assistance with Plaintiffs' business.  Plaintiffs did not provide a copy of any written agreement with Chayasing.

---

reported 15,626 business miles.  (*Id.*)

Plaintiffs did not issue Forms W-2 or 1099 to Chayasing for the 2010 tax year or explain their failure to issue a Form W-2 or 1099.

ORS 305.217 states, in pertinent part:

> "No deduction shall be allowed under ORS chapter 316, 317 or 318 to an individual or entity for amounts paid as wages or as remuneration for personal services if that individual or entity fails to report the payments as required by ORS 314.360 or 316.202 on the date prescribed therefor * * * unless it is shown that the failure to report is due to reasonable cause and not done with the intent to evade payment of the tax imposed by ORS chapter 316 or to assist another in evading the payment of such tax."

OAR 150-305.217(1) states that "[a]n employer will not be allowed a deduction for wages or payments to individuals for personal services rendered if * * * [t]he employer does not file any information returns, such as 1099's or W-2's, as required by federal law, ORS 314.360 or 316.202[.]"  The administrative rule provides the following example:

> "*Example 1*:  Brian owns a convenience store.  Brian hired Elmer to help stock shelves in the evenings.  Brian did not issue W-2's for Elmer.  Brian's expense for payments made to Elmer for services rendered are not deductible."

(Emphasis in original.)  Here, Plaintiffs claimed business deductions totaling $12,200 for payments to Chayasing for his "shipping" and "helping" services.  Plaintiffs failed to report those payments on forms W-2 or 1099 and did not provide any explanation for their failure to report payments to Chayasing.  Under ORS 305.217 and OAR 150-305.217(1), Plaintiffs may not deduct payments to Chayasing.

## III.  CONCLUSION

After careful consideration, the court concludes that Plaintiffs have failed to meet their burden of proof.  Defendant's adjustments to Plaintiffs' 2010 Schedule C income and expenses are supported by the evidence presented.  Now, therefore,

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of December 2013.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on December 30, 2013. The Court filed and entered this document on December 30, 2013.*